**Barbara RICHARDSON, Plaintiff,**

v.

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

No. 97 Civ. 4673(RLC).

United States District Court, S.D. New York.

April 13, 1999.

Bronx Legal Services, Bronx, NY, Tanya Marie Douglas, of counsel, for plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, Susan Baird, Assistant United States Attorney, of counsel, for defendant.

## *OPINION*

ROBERT L. CARTER, District Judge.

Plaintiff Barbara Richardson ("Richardson") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) challeng-

ing the final determination of the Commissioner of Social Security ("Commissioner") that she is not entitled to Supplemental Security Income disability benefits ("SSI"). Both parties move for judgment on the pleadings pursuant to Rule 12(c), F.R. Civ. P.

## BACKGROUND

### I. Procedural history

Richardson applied for SSI on November 3, 1993, alleging that she was disabled since August, 1988, due to a tumor, kidney pain, depression, and a possible liver problem. Her claim was denied on both the initial and reconsideration levels. Richardson appealed the reconsideration denial, requesting a hearing before an Administrative Law Judge ("ALJ"). The hearing occurred on July 11, 1995. Richardson was represented by counsel and testified on her own behalf. There was no other testimony. On December 14, 1995, the ALJ ruled that Richardson was not disabled. Richardson then requested review of the ALJ's determination by the Appeals Council. On April 25, 1997, the Appeals Council denied Richardson's request for review, making the ALJ's decision final. See 20 C.F.R. §§ 404.981, 416.1481. Richardson brought this action on June 25, 1997. See 42 U.S.C. § 405(g). On July 6, 1998, Richardson moved for a judgment on the pleadings pursuant to Rule 12(c), F.R. Civ. P., requesting the reversal of the Commissioner's decision and a holding that Richardson is eligible for SSI; or, in the alternative, a remand for a new administrative hearing. On August 24, 1998, the Commissioner moved for a judgment on the pleadings, requesting that the court affirm his final determination.

### II. Facts

Richardson is a 55 year old female. Richardson earned a General Equivalency Diploma in or about 1975. Her work history is sporadic and brief. For some time during 1966 and between 1968 and 1970, Richardson worked as a welfare caseworker; for less than three months in 1988, she worked as a clerical aid for a welfare center. Otherwise, she has been unemployed. Richardson states that her attempts at securing and maintaining regular employment were unsuccessful because of her "short attention spans," mental depression, and a fibroid condition. (Tr.[1] 35, 37). Richardson left her job in 1988, for instance, due to "an episode coming home during rush hour on the train." (Tr. 34). During this episode, Richardson "starting screaming," "couldn't breathe," and "felt closed in." (Tr. 34). Richardson lived with her mother, up until the latter's death in October, 1994.

#### a. Medical evidence from treating sources

A "Questionnaire as to Residual Functional Capacity: Psychiatric Impairment", dated July 5, 1995 ("RFC Questionnaire") and completed by Dr. Camille and Rose Lederman, a Clinical Social Worker/Therapist ("CSW Lederman"), indicated that Richardson attended a group therapy weekly, had individual therapy sessions on a bi-weekly basis, and saw a psychiatrist once a month for medical evaluations. On the RFC Questionnaire, Dr. Camille stated that "[s]ince mother's death in Oct. 1994, [Richardson] has been increasingly depressed—not leaving house, unable to sleep thru night, eating maybe, 1 meal per/day. More anxious with how to go on with her life—feeling unfocused." (Tr. 126). Dr. Camille also diagnosed Richardson as having a "dysthymia disorder," a form of depression, and a "personality disorder." Dr. Camille reported a Global Assessment of Functioning ("GAF") rating of 65. Based on Richardson's psychiatric status, Dr. Camille opined that Richard-

---

**1.** "Tr." refers to the transcript of the administrative record filed by the Commissioner as

part of his answer.

son had "moderate" limitations on her ability to understand, remember, and carry out instructions, respond appropriately to supervision and co-workers, respond to customary work pressure, satisfy an employer's normal quality, production, and attendance standards, and perform simple tasks in a full-time work setting. (Tr. 127, 129). The limitations on Richardson's ability to perform complex tasks in a work setting was assessed as "marked." (Tr. 129). The term "moderate" was defined as "[a]ffects but does not preclude ability to function." (Tr. 127). The term "marked" was defined as "[s]eriously affects ability to function." (Tr. 127). In addition, Dr. Camille noted that Richardson had been prescribed Zoloft, an antidepressant, and that the medication had improved her ability to sleep and had helped her become less socially isolated. (Tr. 128).

In a letter dated September 17, 1996 ("September 17 letter"), which was presented as new evidence to the Appeals Council, Dr. Camille and CSW Lederman stated that Richardson had been a client at their clinic at the Fordham–Tremont Community Mental Health Center since March 7, 1995 (Tr. 164). Dr. Camille and CSW Lederman remarked that Richardson's "chronic depression persists, with anxiety and sleep difficulties, leading her to tend to be self-isolative." They further stated that Richardson, "though pleasant and cooperative, . . . is unable to manage the ongoing responsibilities that even a work training program would involve, let alone—a work situation." (Tr. 164). Furthermore, in the opinion of Dr. Camille and CSW Lederman, "it is not in the forseen [sic] future, that [Richardson] could comply with [the responsibilities of a work training program or a work situation]." (Tr. 164). Richardson's treatment goals revolved around "focusing on improved daily self-care," such as leaving her apartment a few times a week and eating on a regular basis. (Tr. 164). Dr. Camille and CSW Lederman concluded the letter by

stating, "[Richardson] cannot take on the responsibility of a full-time job." (Tr. 164).

**b. Medical evidence from consulting sources**

On April 19, 1994, Dr. Luis Zeiguer ("Dr.Zeiguer") performed a psychiatric consultation of Richardson. Dr. Zeiguer noted that Richardson had a history of alcohol abuse starting at age 16, but was no longer drinking. (Tr. 132). Dr. Zeiguer's report also noted that Richardson told him that since 1988, she had experienced "shortness of breath, anxiety, accompanied at times by heart pounding and inner tremulousness." (Tr. 132). Richardson also stated that when she was surround by people, she had the "impression that she is the ugliest and smelliest person in the world," and that this intense impression made her uncomfortable. (Tr. 132). Dr. Zeiguer's impression of her mental status included the following comments: she was "clean," established "good eye contact," was "engaged, cooperative," her answers were "prompt and to the point," she was "logical and goal oriented," and that she was not describing "suicidal plans." (Tr. 132). Dr. Zeiguer reported that Richardson's mood was "mildly depressed" and that her mood "remained stable" during the interview. (Tr. 133). He also noted that Richardson arrived at the interview alone by bus, that she took care of all the household chores for her and her mother, that she liked to read and watch TV, and that she had problems sleeping and socializing with others. (Tr. 133). Dr. Zeiguer's overall impression of the information gathered in his interview was that Richardson "should be able to perform at least simple, repetitive chores; relate to peers and/or supervisors; [and] perform tasks without disrupting the work setting." (Tr. 134). However, he also opined that, "[p]resently she may have difficulty performing competitively due to her ideas of reference which accompanied her panic attacks." (Tr. 134).

On April 28, 1994, Dr. Wei Kao ("Dr. Kao") performed a consultative physical examination of Richardson. Dr. Kao reported that Richardson described atypical, sharp chest pains that occurred six to seven times a week. (Tr. 135). However, Dr. Kao's examination of Richardson's heart, abdomen, extremities, chest, muscle strength, neurological and respiratory systems was unremarkable. (Tr. 136–37). With regard to her physical condition, Dr. Kao assessed Richardson's capacity to be "[f]ull" and her function to be "[n]ormal." (Tr. 138).

### c. Records from Union Hospital and St. Barnabas Hospital

Richardson was examined and treated at Union Hospital of the Bronx from January 1, 1991 to October 30, 1993. Richardson was also a patient at the St. Barnabas Hospital from October 25, 1993 to April 25, 1994. The medical records from the two hospitals show that Richardson underwent a variety of tests due to her symptoms of stomach and chest pain. (Tr. 107–114, 115–125, 149–55). A sonogram performed on March 4, 1992 revealed a "markedly enlarged [uterus] consistent with a very enlarged fibroid ...." (Tr. 109). Test results were otherwise unremarkable.

## DISCUSSION

### I. Standards for reviewing the Commissioner's determination

Judicial review of the Commissioner's denial of benefits is strictly limited. *See Batista v. Chater,* 972 F.Supp. 211, 217 (S.D.N.Y.1997) (Sotomayor, J.). It is not the court's function to determine de novo whether the claimant is disabled. *See Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. *See Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). "Substantial evidence" is defined as "more than a mere scintilla. It means such relevant evidence as a reason-able mind might accept as adequate to support a conclusion." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (citation and internal quotation marks omitted).

To be eligible for disability benefits under the Social Security Act, a claimant must establish an "inability to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

While the burden is on the claimant to prove that he is disabled under the Social Security Act, if the claimant shows that his impairment renders him unable to perform his past work, the Commissioner then has "the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986). *See also Schaal,* 134 F.3d at 501.

Utilizing the five step procedure promulgated by the Social Security Administration (the "SSA"), the ALJ found: 1) that Richardson was not engaged in substantial gainful activity; 2) that she had severe impairments which limited her physical and mental ability to do basic work activities; 3) that the impairments did not meet or equal the listed impairments in Appendix 1 of the regulations; 4) that she could not perform her past work because she did not have past work experience; and 5) that she retained a residual functional capacity to do "medium work, in low stress environments." (Tr. 16–17).

## II. Residual functional capacity to work

Richardson first asserts that the Commissioner committed legal error by failing to accord the proper weight to the opinion from the treating psychiatric sources in making his determination that Richardson retained a residual functional capacity to meet the nonexertional demands of medium low stress work. Under the regulations, special evidentiary weight is given to the opinion from the treating sources. Specifically, the regulations state:

> Generally, we give more weight to the opinion from your treating sources .... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If the treating source's opinion is not given controlling weight, the Commissioner applies the following factors to determine the weight to give the opinion from the treating sources: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. *See id.* Furthermore, the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give [claimant's] treating source's opinion." *Id.*

Specifically, Richardson objects to the failure of the Appeals Council to review the ALJ's determination in light of the new evidence submitted by Dr. Camille and CSW Lederman, who are undisputedly Richardson's treating sources, in the September 17 letter. While the Appeals Council noted that it had considered the letter from Dr. Camille and CSW Lederman, it nevertheless concluded that the additional evidence did not provide a basis for changing the ALJ's decision. (Tr. 3). Richardson contends that the Appeals Council committed legal error by failing to give controlling weight to the opinion from Dr. Camille and CSW Lederman that Richardson could not comply with the responsibilities of a work training program or a work situation. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings at 13–14). The Commissioner asserts in response that the Appeals Council properly refused to review the ALJ's decision because the decision was supported by substantial evidence, and because the September 17 letter was submitted nine months after the ALJ's decision and contained no clinical or diagnostic findings to support the conclusion that Richardson was disabled. (Mem. of Law in Supp. of Commissioner's Mot. for J. on the Pleadings at 15).

 With respect to the Commissioner's suggestion that the September 17 letter from Dr. Camille and CSW Lederman should be disregarded because the letter was submitted nine months after the ALJ's decision, the Social Security regulations expressly authorize a claimant to submit new, material evidence to the Appeals Council when requesting review of an ALJ's decision.[2] *See* 20 C.F.R. §§ 404.970(b), 416.1470(b). *See also Perez v. Chater,* 77 F.3d 41, 44 (2d Cir.1996). If the new, material evidence relates to a period before the ALJ's decision, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted ... [and] then review the case if it finds that the administrative law judge's action, findings, or conclusions is contrary to the weight of the evidence currently of record." 20 C.F.R.

---

**2.** This evidence becomes part of the administrative record on appeal to the federal courts when the Appeals Council denies review. *See*

*Schaal v. Apfel,* 134 F.3d 496, 505 n. 8 (2d Cir.1998) (citing *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996)).

§§ 404.970(b), 416.1470(b). It is clear, then, that the fact that the letter was submitted to the Appeals Council on first impression does not, by itself, render Dr. Camille's and CSW Lederman's opinion of less import so long as the evidence submitted was new, material, and related to a period before the ALJ's decision.[3]

 The Commissioner also contends that the September 17 letter was properly given little or no weight because it contained no clinical or diagnostic evidence to support the conclusion that Richardson was disabled. It is a well-settled rule in the Second Circuit that the Commissioner must affirmatively develop the administrative record due to the essentially non-adversarial nature of a benefits proceeding. See Pratts v. Chater, 94 F.3d 34, 37 (2d Cir.1996). "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when, as here, the claimant is represented by counsel." Id. (citations omitted).

The Second Circuit recently explored the contours of the Commissioner's affirmative obligations under the Social Security regulations in Clark v. Commissioner of Soc. Sec., 143 F.3d 115 (2d Cir.1998). In Clark, the plaintiff claimed that she was disabled as a result of pain caused by the surgical removal of a benign lesion in her leg. See id. at 117. The medical record consisted of two reports by her treating physician and a report by a consulting physician. See id. The first of the reports by her treating physician, dated September, 1993, stated that the claimant was experiencing pain, weakness, and decreased sensation in her right leg. See id. Nevertheless, according to the September, 1993 report, the claimant had the ability to stand, sit or walk for eight hours a day, could occasionally lift and carry a maximum of 25 pounds, and had no limitations with regard to hand and foot controls. See id. A September, 1993 report by a consulting physician indicated similar findings. See id. In the second report, dated July, 1994, the treating physician once again stated that claimant was suffering from pain and numbness in her leg. See id. However, the treating physician's evaluation of the claimant's functional capacity had changed. See id. In contrast to his earlier report, the treating physician indicated that the claimant could only stand for one hour and sit for four hours out of an eight-hour workday, and that she needed to lie down during the day when tired. See id. The treating physician also opined that the claimant could walk for only one block without stopping. See id. The treating physician did not attach any clinical or objective findings to this second report. See id.

**3.** To the extent that the Commissioner suggests that the September 17 letter should be disregarded on the grounds that the evidence is not new or material to a period before the ALJ's decision, the court finds that argument to be meritless. First, the evidence is undoubtedly new, as the letter contains a diagnosis by Dr. Camille and CSW Lederman that was not before the ALJ: the categorical opinion that Richardson could not take on the responsibilities of a work situation due to her chronic depression. Second, on the question of whether the evidence was material to the relevant time period, "[a] post-determination diagnosis that indicates true disability prior to the ALJ determination is relevant—whether the diagnosis relates to a previously unrecognized condition, or whether it reveals the depth of an illness recognized, but not fully appreciated at the time of the hearing." Bosmond v. Apfel, 1998 WL 851508, *12 (S.D.N.Y. Dec.8, 1998) (Patterson, J.). Cf. Brown v. Chater, 932 F.Supp. 71, 75 (S.D.N.Y. 1996) (Chin, J.) (holding that evidence based on new asthma attacks that occurred after ALJ hearing as immaterial to present application for benefits). In the instant case, the September 17 letter concerned the treatment of Richardson in a period before the ALJ hearing and purported to reveal the true depth of her depression during that time. Thus, the evidence is material to the relevant period, and is properly considered by the Appeals Council and the court as part of the administrative record. See 20 C.F.R. §§ 404.970(b), 416.1470(b); Schaal, 134 F.3d at 505 n. 8.

The ALJ in *Clark* found that the claimant was not disabled, based in particular on the September, 1993 reports of the treating physician and the consulting physician. *See id.* The ALJ noted that he had considered the treating physician's second report, but had not given the opinion controlling weight because the treating physician had failed to mention clinical or objective findings to support his conclusion that the claimant's functional capacity had decreased, and had failed to explain why the claimant's leg problem would preclude her from sitting six hours per day. *See id.*

After assessing the ALJ's determination, the Second Circuit concluded that there was, "to say the least, a serious question as to whether the ALJ's duty to develop the administrative record was satisfied in this case." *See id.* at 118. The Court noted that simply because the second report did not mention clinical or objective evidence did not mean that such support did not exist. *See id.* If asked, the treating physician "might have been able to provide a medical explanation for why [the claimant's] condition deteriorated over time," and "might have been able to offer clinical findings in support of his conclusion that [the claimant] could not sit for most of the day." *Id.* Reasoned the Court, the treating physician "might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Id.* The Court vacated and remanded the case to the district court for reconsideration under the Second Circuit's then-recent opinion in *Schaal v. Apfel*, 134 F.3d 496 (2d Cir.1998) which held, *inter alia*, that "even if clinical findings were inadequate, it was the ALJ's duty to seek additional information from the [treating physician] sua sponte." *Id.* at 505 (citing *Perez*, 77 F.3d at 47).

■ The facts of the instant case are analogous to those in *Clark*. As in *Clark*, Richardson submitted two reports by her treating physician dated approximately one year apart. Both reports described the same symptoms, but the second report assessed Richardson's impairments to be more severe in nature. In the first report, Dr. Camille identified Richardson as having a dysthymia and a personality disorder, but stated that Richardson only had "moderate" limitations in her ability to work with others and follow orders. The ALJ properly considered this as evidence that Richardson did not have a disabling nonexertional impairment, as the term "moderate" is defined as "[a]ffects but does not preclude ability to function." (Tr. 128). The second report by Dr. Camille described the same psychological disorders, but stated categorically for the first time that Richardson could not take on the responsibilities of a work situation. (Tr. 164). This new evidence should not have been dismissed by the Appeals Council on the grounds that the report did not mention clinical or objective findings because the Appeals Council, which must follow the same rules as the ALJ follows in considering opinion evidence, *see* 20 C.F.R. § 404.1527(f)(3), had an affirmative obligation to make an attempt to secure the additional clinical or objective support it required from Dr. Camille. *See also Clark*, 143 F.3d at 118.

The Social Security regulations also delineate the affirmative obligations of the Commissioner in making disability determinations. *See* 20 C.F.R. § 404.1512(e)(1). While the regulations give the Commissioner the discretion to decline to seek additional evidence or clarification "from a medical source *when we know from past experience that the source either cannot or will not provide the necessary findings*," 20 C.F.R. § 404.1512(e)(2) (emphasis added), neither the Appeals Council nor the Commissioner in his brief on this motion has alleged that this was the reason that additional information was not sought from Dr. Camille. Rather, the Commissioner argues that the second report simply did not contain "clinical or diagnostic findings to support the conclusion that the plaintiff was disabled." (Mem. of Law in Supp. of

Commissioner's Mot. for J. on the Pleadings at 15). Absent a valid explanation as to why the Appeals Council failed to seek out the clinical or diagnostic findings it required, such as Dr. Camille's known inability or unwillingness to "provide certain tests or procedures," 20 C.F.R. § 404.1512(f), the court is not satisfied that the Commissioner has fulfilled his affirmative obligation under the Social Security regulations and Second Circuit jurisprudence.

Because the Commissioner did not discharge his affirmative duty to fully develop the administrative record with regard to Richardson's mental impairments and failed to give a valid reason for not doing so, the court finds that the Commissioner committed legal error. *See also Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir.1999) (holding that Commissioner committed legal error by foregoing opportunities to develop claimant's medical history and by rejecting treating physician's medical assessment without fully developing factual record).

### III. Use of the Medical–Vocational Guidelines

After finding that Richardson retained a residual functional capacity to meet the demands of medium, low stress work, the Commissioner applied the Medical–Vocational Guidelines (the "grids") to conclude that Richardson was not disabled. The Commissioner bears the final burden of proof for the final determination of disability. *Pratts*, 94 F.3d at 38. "Generally speaking, if a claimant suffers only from exertional impairments, e.g., strength limitations, then the Commissioner may satisfy [his] burden by resorting to the [Medical–Vocational Guidelines]." *Id.* at 38–39. However, if the claimant suffers from significant nonexertional impairments,[4] " 'application of the grids is inappropriate.' "

4. Nonexertional impairments include anxiety and depression. 20 C.F.R.

*Rosa*, 168 F.3d 72, 81 (quoting *Bapp*, 802 F.2d at 605–06). Instead, "the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.' " *Id.* (quoting *Bapp*, 802 F.2d at 603).

Under the circumstances, the court finds that the Commissioner's application of the grids to Richardson's case was in error. The evidence thus far indicates that Richardson's nonexertional impairment may be significant, i.e., one that "so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606. In order to avoid another remand of this case to the Commissioner, the court directs the Commissioner to secure the services of a vocational expert if he finds after carefully considering the fully developed record that Richardson suffers from a significant nonexertional impairment.

### CONCLUSION

The Commissioner failed to develop sufficient evidence of plaintiff's nonexertional mental impairments to properly evaluate plaintiff's residual functional capacity and accurately apply the Medical–Vocational Guidelines to this case. This case is remanded to the Commissioner for reconsideration in accordance with this Opinion. Specifically, the Commissioner is directed to: (1) seek additional evidence from Dr. Camille, and any other sources he finds appropriate, on the nature and severity of Richardson's mental impairments; and (2) secure the services of a vocational expert if he finds that Richardson suffers from a "significant" nonexertional impairment based on the fully developed record.

**IT IS SO ORDERED.**

§ 404.1569a(c)(1)(i).